NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 12, 2025

S25A0492. REYNOLDS v. THE STATE.

MCMILLIAN, Justice.

Jeremy Aloysius Reynolds, Jr., appeals his conviction for malice murder arising from the shooting death of Barry Bullard.[1] In his sole enumeration of error, Reynolds asserts that the evidence was insufficient as a matter of constitutional due process to sustain

---

[1] Bullard was killed on July 30, 2008. In September 2008, a Tift County grand jury jointly indicted Reynolds, Neddrick Green, and Allen Williams for malice murder and separately indicted Reynolds for possession of cocaine. Williams was tried individually in February 2011 and convicted of malice murder. Green and Reynolds were jointly tried before a jury in November 2010, and both were found guilty of malice murder. Reynolds was also found guilty of possession of cocaine. Both Williams's and Green's convictions were later affirmed by this Court. See *Williams v. State*, 307 Ga. 689 (2020); *Green v. State*, 302 Ga. 816 (2018). The trial court sentenced Reynolds as a recidivist to serve life in prison without the possibility of parole for malice murder and a concurrent term of 30 years for possession of cocaine. Reynolds timely filed a motion for new trial, which was amended through new counsel on July 31, 2023. Following a hearing, the trial court denied the motion for new trial, as amended, in August 2023. Reynolds timely filed his notice of appeal, and his case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

his conviction for malice murder.[2] Because the evidence presented at trial was sufficient to authorize a rational trier of fact to find Reynolds guilty of malice murder beyond a reasonable doubt, we affirm.[3]

The evidence presented at trial showed that Bullard had once been friends with Reynolds's co-defendants, Allen Williams and Neddrick Green, but the men had a dispute, in which Williams felt "betrayed" because he believed that Bullard had stolen a gun from him. As a part of this "beef," Bullard had repeated confrontations with Williams. After Bullard's home was shot at, Bullard reported

---

[2] Reynolds does not contest the sufficiency of the evidence for his conviction for possession of cocaine.

[3] We take this opportunity to note that with the 14-year delay between Reynolds's sentencing and the docketing of his appeal in this Court, this appeal joins "a recent raft of cases with lengthy, unexplained, and unjustified delays between trial and appeal, both in this Court and in our Court of Appeals." *Sturkey v. State*, 319 Ga. 156, 164 (2024). Although some of the delay in this case relates to evaluating Reynolds's mental competency for purposes of his ineffective assistance claim alleging counsel's failure to obtain a mental evaluation before trial, it appears that the case was essentially dormant between 2010 and 2017, when current appellate counsel was appointed. It then took another seven years to complete the mental evaluation, get a decision on the motion for new trial, and have the appeal docketed in this Court. We reiterate that it is the duty of all those involved in the criminal justice system, including trial courts, prosecutors, defense counsel, and defendants "to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." Id. at 164–65 (citation and punctuation omitted).

to police officers that Williams, Green, and Reynolds had been driving by his home in Williams's gold Lexus and that he thought the three men "were after him."

On the evening of July 30, 2008, Ernest Jackson went to Bullard's home in Tift County to let Bullard know that Williams was driving through their neighborhood repeatedly "mugging" or aggressively looking at their group. Jackson and Bullard went outside with Michael Taylor, another friend of theirs. Taylor testified that they saw Williams drive by, with Reynolds in the passenger seat and Green in the back seat. They watched as Williams backed into a parking lot across the street where Green got out of the car, reached for an object, and then jumped back into the car. Williams then drove "straight across full speed" to where Taylor, Jackson, and Bullard were standing in the yard.

Taylor was afraid that they were "fixing to come shooting," so he went behind a building to hide. He heard Bullard challenge the three men, "What y'all looking for us for? We ain't scared of y'all." Green responded, "[S]hut up, n****r." Williams said, "I'm ready to

die. I've been snorting all night." Taylor also heard someone tell Jackson, "[Y]ou lucky this ain't got nothing to do with you." Then he heard a single gunshot followed by "a lot more shots."

Jackson testified that he stayed in the yard and saw Bullard with a gun that he kept "down by his side." Williams and Green, each carrying a gun, got out of the car and walked up to Jackson and Bullard. Williams told Jackson, "[Y]ou lucky I know your folks, otherwise I do something to you, too." Bullard, who had accidentally shot himself in the leg a few weeks prior, was still unable to walk well and backed himself up against a tree in the yard. Green and Williams began hitting Bullard in the face and trying to take the gun out of Bullard's hand. Bullard refused to relinquish his gun and told them "to chill." Jackson never saw Bullard raise his gun. When they realized that Bullard was not going to hand over his gun, Green and Williams started to walk away, but Reynolds "walked up and just put the gun to [Bullard's] head and shot him." Jackson, fearing for his safety, immediately ran away. Jackson identified Reynolds as the shooter at trial.

Reynolds, Williams, and Green attempted to escape in Williams's Lexus, but they hit a mailbox and a trash can, which lifted the car off the ground. One witness saw "the boys" get out of the car and run from the scene. The first responding officer arrived at the scene at 9:35 p.m., just two minutes after the initial 911 call and saw "mass pandemonium" with residents "running everywhere." He found Bullard lying on the ground, breathing very faintly. By the time paramedics arrived to assist, Bullard was deceased. Officers discovered that the Lexus was still running with the keys in the ignition and the doors open. Surveillance video retrieved from the apartment complex across the street from where the shooting occurred showed the Lexus backing into the apartment complex and later crashing into a trash can. Fingerprints obtained from the Lexus matched Reynolds's fingerprints.

Tiffany Ewings, who lived in the apartment complex, testified that she saw Williams's gold Lexus back into a parking space in the apartment complex with Williams, Green, and Reynolds, whom she knew as "Miami," inside. She saw Green get out of the car with "a

5

long gun" and look across the street, where Bullard "and all of them boys" were standing. Then Green got back in the car, and the Lexus "mashed across the street, like, varoom" into the yard across the street. Shortly after that, she heard gunshots and looked out and saw "the boys running off the scene."

Shamira Wilcox was visiting her sister, who lived nearby, and saw Taylor, Jackson, and Bullard in the yard near Bullard's home. After hearing a commotion, she heard Bullard say, "I ain't got no beef with y'all, I ain't got no beef with y'all." She then heard multiple gunshots and called 911. Another witness, Linda Rogers, was outside one block away when she heard gunshots. She then saw Reynolds and Williams running down the street away from the scene. She noticed that Williams was limping and that Reynolds was trying to hold Williams up. She also saw that Reynolds was holding a black handgun. Tyrone Lester was sitting outside speaking with Rogers at the time. He ducked behind a car when he heard the shooting and saw Reynolds running down the street, beckoning Williams and saying, "[c]ome on, come on" to Williams. He saw

Reynolds carrying a black handgun.

Jocelyn Barnes, Williams's girlfriend, testified that, when Williams arrived at her home that evening, he was limping and said that a man named Love had shot him. He also said that Bullard had been shot but did not tell her who had shot him. Shortly thereafter, Green and Reynolds also arrived at Barnes's home. She thought that Reynolds was being "hyperactive," and he told her, "[W]ell, I bumbaclot the n****r, MIA don't play."[4] Reynolds was repeatedly laughing, acting like he had won "a trophy" and saying, "Miami ain't no joke, MIA for life."

The group eventually decided to go to a hospital to seek treatment for Williams's injury. Green's brother arranged a ride with his friend, Jarvis Watts, who drove Green's brother, Williams, Reynolds, and Barnes to a hospital in Ocilla, Georgia. During the car ride, Barnes tried to determine who killed Bullard; Williams would not tell her, but he repeatedly looked over his shoulder at

---

[4] Barnes explained that "bumbaclot" was Jamaican slang for having killed someone.

Reynolds. At the hospital, they signed Williams in under a false name at Reynolds's advice to avoid detection from police officers. The group left Williams at the hospital and returned to Tifton.

The following morning, Willie Harris was sweeping around his house located near the apartment complex across the street from where the shooting occurred and found a gun in his yard. Harris contacted law enforcement officers, who determined the weapon was a 9mm Stallard Arms handgun. Rogers testified that the gun appeared to be the same one she saw Reynolds holding as he ran from the scene. One officer compared the outline of the barrel of that firearm to the outline of the wound on Bullard's face and found that they were the same.

While officers were conducting a search of the home where Green lived with his mother, they saw a foot sticking out from under a couch, found Reynolds hiding there, and placed him under arrest. Officers also recovered a sawed-off shotgun and a .38-caliber pistol from the home. While Reynolds was being processed at the jail, officers noticed Reynolds chewing on five yellow baggies with a

white powdery substance inside. A deputy collected the five baggies, and a Georgia Bureau of Investigation agent tested the substance inside, which tested positive for cocaine.

The medical examiner who performed Bullard's autopsy testified that Bullard had suffered a gunshot wound that entered his left cheek and exited his right cheek, fracturing his facial bones and injuring his tongue. Although the wound would not have been immediately fatal, it caused excessive bleeding that traveled down Bullard's airway and asphyxiated him. The gunshot was fired at contact range, meaning the gun was directly against Bullard's face when he was shot.

In his sole enumeration of error, Reynolds claims that the evidence was not sufficient as a matter of constitutional due process to support his conviction for malice murder. When this Court reviews the sufficiency of the evidence as a matter of constitutional due process, we review the evidence in the light most favorable to the jury's verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the

crimes of which he was convicted. See *Jackson v. Virginia*, 443 US 307, 319 (1979). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Wilkerson v. State*, 317 Ga. 242, 245 (2023) (citation and punctuation omitted). We conclude that the evidence here, as testified to by multiple eyewitnesses at the scene and by Barnes, was more than sufficient to sustain Reynolds's conviction for malice murder. See *Dillard v. State*, 321 Ga. 171, 174–75 (2025) (evidence was sufficient as a matter of constitutional due process to support appellant's conviction for malice murder where eyewitness testified at trial that appellant shot the victim in the side of the face after the victim resisted appellant's efforts to take his belongings).

Reynolds nonetheless argues that the evidence was insufficient because the State failed to present confession evidence, DNA evidence, or video or photographic evidence positively identifying Reynolds as the shooter and because the State failed to identify a

motive for the malice murder of Bullard. These arguments fail.

We have previously explained that, "although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Ellington v. State*, 314 Ga. 335, 341 (2022) (cleaned up). See also *Jones v. State*, 319 Ga. 758, 761 (2024) ("[T]he fact that the State did not produce certain types of evidence does not mean that the evidence was insufficient." (citation and punctuation omitted)). Nor is the State required to introduce evidence of motive in order to support a guilty verdict on the charge of malice murder. See *Adams v. State*, 318 Ga. 105, 112–13 (2024) (explaining that evidence of motive for murder is always relevant, but it is not required because motive is not an essential element of the crime). For these reasons, we reject Reynolds's arguments that the evidence was insufficient as a matter of constitutional due process to support his malice murder conviction.

*Judgment affirmed. All the Justices concur, except Land, J., not participating.*

11